,91
Rev. 11/82

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>VAHE DAVIDYAN<br>ROMAN YERITSYAN<br>ARTIN MARGOUSIAN<br>ALBERT VEISYAN<br>GENNADI APIKOV<br>HARUTYUN KARAPETYAN, and<br>ARTUR GHAZARYAN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>**13 - 1429M** |
|---|---|

Complaint for violation of Title 18, United States Code, Section 1349, conspiracy to commit bank fraud

| NAME OF MAGISTRATE JUDGE<br><br>Hon. Andrew J. Wistrich | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>2012 through the present | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or before 2012, and continuing through May, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants VAHE DAVIDYAN, ROMAN YERITSYAN, ARTIN MARGOUSIAN, ALBERT VEISYAN, GENNADI APIKOV, HARUTYUN KARAPETYAN, and ARTUR GHAZARYAN (collectively, "defendants"), and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344. The object of the conspiracy was to be carried out, in substance, as follows: defendants would use counterfeit bank-issued credit cards that contained the account information of actual individuals to purchase fuel in bulk which they would store in home-made, hundred-gallon fuel tanks hidden in their vehicles before transferring the fuel to a tanker truck for resale. Federally-insured financial institutions which suffered actual losses as a result of this conspiracy include Wells Fargo Bank, Bank of America, Citi Bank, and Capital One Bank.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Mark Ham |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, United States Secret Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>ANDREW J. WISTRICH | DATE<br><br>May 24, 2013 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA Andrew Brown (x0102, 11th Floor)          **WARRANTS**          Detention Requested

I, Mark Ham, being duly sworn, declare and state:

## INTRODUCTION AND EXPERTISE

1.    I am a Special Agent with the Department of Homeland Security, United States Secret Service ("USSS"). I have been employed as a Special Agent ("SA") with the USSS since August of 2010. As a SA with the USSS, my duties have included investigating violations of federal laws concerning fraud and related activity in connection with access devices, bank fraud, wire fraud, identity theft, and other federal financial crimes. I am currently assigned to the Los Angeles Fraud Task Force (LAFTF), which is responsible for the investigation of financial crimes, specifically skimming and access device fraud. I am a graduate of the Criminal Investigator Training Program conducted at the Federal Law Enforcement Training Center Glynco, Georgia. I have received additional law enforcement training from the USSS Special Agent Investigator Training Course in Beltsville, Maryland and the Department of Criminal Justice Training Police Academy in Richmond, Kentucky. I have held one other position in law enforcement, as a Police Officer for the City of Florence, Kentucky from November of 2003 till July of 2010. I have investigated multiple cases involving access device fraud in over (9) nine years of law enforcement experience. I am a graduate of Georgetown College with a Bachelors degree in Political Science and a graduate of Northern Kentucky University with a Masters degree in Public Administration.

## PURPOSE OF AFFIDAVIT

### CRIMINAL COMPLAINT

2.    This affidavit is made in support of a criminal complaint and arrest warrants charging VAHE DAVIDYAN (hereinafter "DAVIDYAN"), ROMAN YERITSYAN (hereinafter "YERITSYAN"), ARTIN MARGOUSIAN (hereinafter "MARGOUSIAN"), ALBERT VEISYAN (hereinafter "VEISYAN"), GENNADI APIKOV (hereinafter "APIKOV"), HARUTYUN KARAPETYAN (hereinafter "KARAPETYAN"), and ARTUR GHAZARYAN (hereinafter "GHAZARYAN") (collectively, the "TARGETS") with 18 U.S.C., Sections 1349 and 1344, conspiracy to commit bank fraud.

### SEARCH WARRANTS FOR PREMISES

3.    This affidavit is also made in support of the issuance of search warrants to search the following premises:

1

1) A sub-divided garage space, located within 4915 Sheila St., Commerce, CA (hereinafter "COMMERCE DEPOT"). The entrance to the property is directly off of Sheila Street and is marked by a small sign hanging above the Sheila St. sidewalk attached to a pole near the Sheila St. driveway entrance. The sign reads: "4915", the numbers are painted in gold on a blue background on the side of the sign that faces east, the west facing side of the sign has the numbers "4915" painted in blue on a gold background. 4915 Sheila St. consists of a truck parking lot to the east, and a subdivided building to the west. Working from the south end of the building to the north, the portion of the building nearest Sheila St. is a two-story light colored stucco office space with a flat roof and its east facing wall is perpendicular to Sheila Street. Connected to the north side of the office portion of the building is a large warehouse with a large vehicle entrance immediately next to the office. The warehouse portion of the building has a rounded roofline and two awnings hanging over portions of the parking lot area. The two awnings hang from the top of the east facing exterior wall which is also perpendicular to Sheila Street. As you proceed north towards the rear of the property, the east facing exterior wall angles in, approximately forty-five degrees in relation to Sheila St., and is the only portion of the east facing wall to do so. This angled area of the east exterior wall is the entrance to the premises to be searched, COMMERCE DEPOT. COMMERCE DEPOT is painted white, has a flat roof, a large white roll-up garage door, and a light grey pedestrian door located just north of the garage door. There are sections of exposed wood panels around the pedestrian door and above the roll-up garage door. To the north of COMMERCE DEPOT, the east facing wall of the building angles back to orient perpendicular to Sheila Street and makes-up the northern most portion of the building. (A photograph of 4915 Sheila St., Commerce, CA, is attached to search warrant for COMMERCE DEPOT, and includes a box drawn around the area to be searched, which is marked "COMMERCE DEPOT" in handwriting).

2) A-Z Gas Station, located at 16940 E. Gladstone St. Azusa, CA (hereinafter "A-Z GAS STATION"), which is further described as a single-story brick building, painted grey. The trim of the pitched roofline is painted blue. The numbers "16940" are affixed above the main public entrance of the building with faces northeast. A sign reading "A-Z Gas & Smog" in red letters with blue trim against a white background is affixed to the building above the main public door as well. There are four fuel islands under a canopy on the north side of the property and two fuel islands under a canopy on the east side of the

property.  Access can be made to the property from E. Gladstone St. to the north and Lark Ellen Ave. to the east.  Attached to A-Z GAS STATION is one garage bay in the southeast portion of the building.  The premises to be searched include the garage bay.

3) Petro Bras gas station, located at 7515 Alondra Blvd. Paramount, CA (hereinafter "PETRO BRAS GAS STATION"), which is further described as a single story tan building with a flat roof.  A sign reading "Food Mart" in red letters is affixed to the building above the main public door on the west end of the building.  The numbers "7515" are attached to the building in black numerals just east of the main entrance door.  There are four fuel islands under a canopy on the south side of the property and a single fuel island without a canopy on the east side of the property.  Access can be made to the property from Garfield Ave. to the west and Alondra Blvd. to the south.  Attached to Petro Bras gas station is one garage bay to the east of the main public door.

4) The residence of Vagarshak HOVANESYAN, located at 1735 N. Normandie Ave. #201 Los Angeles, CA (hereinafter "HOVANESYAN'S RESIDENCE"), which is further described as a unit in a pale yellow, three-story, multi-unit residential building with a below ground parking garage situated on the west side of the street.  The building also has a partial Spanish tile roof line at the top of the east facing wall.  Above the east-facing parking garage entrance gate, aligned with the second floor of the property, are dark colored letters over dark colored numbers, that are followed by one letter reading: "Normandie / 1735 N".  Three narrow east facing windows, situated in the center of the building, run the entire vertical height of the building and are rounded on both ends.  The entrance to unit #201 is located on the second floor.  Take stairs to floor #2, take a right turn down main (and only) hall way.  HOVANESYAN'S RESIDENCE will be the first door on the left with business hours posted on the drywall by the top left of the door with a wireless door bell stuck to the wall about 3 ft off the ground also on the left side of the door.  The numbers "201" are posted on the center of the peach colored door.

5) The residence of Robert OGANESIAN, located at 217 N. 6th St. Apartment G, Burbank, CA (hereinafter "OGANESIAN'S RESIDENCE"), which is further described as an apartment in a multi-unit, multi-story residential apartment building.  The building is generally sheathed in gray stucco with white wood trim and additional stone trim.  The building is clearly marked with the numbers "217" in blue lettering.  Unit "G" is the second unit west of E. Orange Grove Avenue and is identified by a blue door with the letter "G"

clearly visible on the front.  Unit "G" shares a stairwell accessed from the street with Unit "H".  Additionally, Unit "G" sits directly above an underground garage access gate.

6) The residence of Roman YERITSYAN, located at 617 E. Garfield Ave., apartment 214, Glendale, CA (hereinafter YERITSYAN'S RESIDENCE), which is further described as a unit in a multi-unit, multi-story residential apartment complex clad primarily in smooth yellow stucco.  The building is identified by the numerals "617" in black lettering on the front of the building.  The building is horseshoe shaped with a central courtyard, which serves as the primary entrance.  Entry to the courtyard is through a non-locking gate with the words "El Seville " in metal overhead.  Apartment number 214 is located on the second floor of the building and is accessed via an internal stairwell.  YERITSYAN'S RESIDENCE is identified by the gold  numerals "214" affixed to the top of a white door.

7) The residence of Artur GHAZARYAN, located at 409 W. Lomita #217, Glendale, CA (hereinafter GHAZARYAN'S RESIDENCE) is an apartment in a multi-unit, multi-story residential apartment complex.  The primary structure is clad in red brick, tan stucco and red wood siding, in approximately equal parts.  The building address is prominently identified by the large, black numerals "409" above the main entrance.  As you enter the building through the front door, proceed forward 15 yards to the stairs, which are located in the middle of the courtyard. Go up one flight and turn left at the top of the stairs and proceed forward. GHAZARYAN'S RESIDENCE will be on the right, second one from the corner.  The brass colored numbers "217" appear at the center of a red painted door.

8) The residence of Harutyun KARAPETYAN, located at 2841 Montrose Avenue #3, La Crescenta, CA (hereinafter KARAPETYAN'S RESIDENCE) is an apartment in a multi-unit, multi-story residential apartment complex.  The primary building is clad in tan stucco and shares a lot with building number 2851.  2841 is the eastern most building on the property and is identified by the numerals "2841" prominently displayed in black on a small building adjacent to the pool.  Unit #3 is located on the second floor of the building and is accessed from the street via a set of exterior stairs.  Unit #3 is identified by the numeral "3" on a brown door.  Unit #3 is directly above, and overlooks, the pool.

9) The residence of Albert VEISYAN, located at 5524 Corteen Pl. #2 Valley Village, CA (hereinafter VEISYAN'S RESIDENCE) is an apartment in a multi-unit apartment building that is tan stucco with grey trim.  Building 5524 is so designated by grey numbers displayed on the front of the building facing Corteen Place.  Apt 2 is immediately on the

right hand side after entering the common entryway.  The apartment door is white and is marked by a gold colored metal number "2" displayed in the center of the door at eye level.

10) The residence of Artin MARGOUSIAN, located at 16850 Chatsworth St. #13 Granada Hills, CA (hereinafter MARGOUSIAN'S RESIDENCE) is a unit in a two-story, multi-unit brick and stucco structure with green and white trim.  There are wooden double doors with a large green awning located above with the numbers "16850" printed in white on the awning.  Upon entering main double doors for 16850, proceed to the stairway on the right (20 feet away).  MARGOUSIAN'S RESIDENCE is the door right at the top of the stairs on the 2nd level.  The numbers "13" are posted on the center of the green colored door.

11) The residence of Gennadi APIKOV located at 7338 Balboa Blvd. #9 Van Nuys, CA (hereinafter APIKOV'S RESIDENCE) is a unit in a multi-unit building that is light-tan stucco with an orange-red tile roof.  The building address is designated by black colored metal numbers "7338" mounted on the right side of the wall facing Balboa Blvd.  The apartment location is at the back of the building and is behind a dark brown colored wooden door.  APIKOV'S RESIDENCE is designated by a black colored metal number "9" mounted in the center of the door above a small decorative window.

12) The residence of Vahe DAVIDYAN located at 13733 Burbank Blvd. #201 Van Nuys, CA (hereinafter DAVIDYAN'S RESIDENCE) is a unit in a secured, multi-unit, light tan colored stucco building with darker tan wood trim.  The building has red colored numbers "13733" approximately 12 inches in height mounted above the common entry way, facing Burbank Blvd.  As you enter the front door to the building, the first door on the right inside the lobby is for the southeast stairwell which is enclosed, continue up 2 flights to the 2nd floor. Access the door at the top of the landing. DAVIDYAN'S RESIDENCE is the first door on the left side of the hallway approximately 10 yards from the stairwell. The door is turquoise colored with brass numbers "201" centered above a brass door knocker.

<u>SEARCH WARRANT FOR VEHICLES</u>

    4.  This affidavit is further made in support of the issuance of search warrants to search the following vehicles:

1)   THE FUEL TANKER TRUCK, which is further described as a white 1989 Peterbilt fuel tanker truck, vehicle identification number ("VIN") 1XPFL29X9KD270397, bearing California license plate 8U67487.

2) FUEL TRUCK-2, which is further described as a white 2002 Ford utility truck, VIN 1FTNF20F92EB99396, bearing California license plate 69644B1.

3) FUEL TRUCK-3, which is further described as a brown 2002 Ford sport utility vehicle, VIN 1FMSU43F72EA15049, bearing California license plate 6LOW950.

4) FUEL TRUCK-4, which is further described as a two-tone white over tan 2003 Ford sport utility vehicle, VIN 1FMSU45P13EC48030, bearing California license plate 5EUA933.

5) FUEL TRUCK-5, which is further described as a white 2001 Ford utility truck, VIN 1FDWF36F91EB28873, bearing California license plate 8X78420.

6) FUEL TRUCK-6, which is further described as a grey 1999 Dodge utility truck, VIN 3B6KC26Z6XM580951, bearing California license plate 5Y61224.

7) FUEL TRUCK-7, which is further described as a white 2002 Ford utility truck, VIN 1FTNF20F02EB99397, bearing California license plate 81868D1.

8) FUEL TRUCK-8, which is further described as a white 2005 Ford utility truck, VIN 1FDWF36PX5EB41193, bearing California license plate 8X78397.

9) HOVANESYAN'S VEHICLE-1, which is further described as a silver 2004 Mercedes Benz sedan, VIN WDBNG75J34A398282, bearing California license plate 5GDL159

10) HOVANESYAN'S VEHICLE-2, which is further described as a grey/gold 2006 BMW sport utility vehicle, VIN 5UXFB53X6LV21659, bearing California license plate 6RNB736

11) HOVANESYAN'S VEHICLE-3, which is further described as a white 2006 Mercedes Benz sedan, VIN WDBRF52H16F830335, bearing California license plate 6FYZ394

12) OGANESIAN'S VEHICLE, which is further described as a white 2005 Chevrolet pick-up truck, VIN 1GCDS196658206585, bearing California license plate 7T05781

## PROBABLE CAUSE

OVERVIEW OF INVESTIGATION

5. During the course of this investigation, members of the United States Secret Service (hereinafter "USSS") Los Angeles Fraud Task Force (hereinafter "LAFTF") have conducted surveillance of the TARGETS. Based on this investigation, I believe the TARGETS have been driving various utility trucks, FUEL TRUCKS 2-8, to multiple gas stations, using multiple unauthorized access devices issued by banks to make purchases of diesel fuel. (In my training and experience, all the banks mentioned in this affidavit are federally insured). Based on the large volume of diesel fuel the TARGETS are pumping into their utility trucks, it is believed that the trucks have been modified to contain fuel storage tanks, hidden from plain view, where the diesel fuel is stored. Once the fuel tanks are full, the TARGETS drive to one of two industrial properties located at 1878 E. 43rd St. Vernon, CA (hereinafter "Vernon Depot", which is not part of this warrant) or COMMERCE DEPOT to unload the fuel into a larger fuel tanker truck, THE FUEL TANKER TRUCK. Once the larger fuel tanker truck is full, it delivers the fraudulently obtained diesel fuel to collusive gas stations, A-Z GAS STATION and PETRO BRAS GAS STATION, in the greater Los Angeles area.

6. Based on my training and experience, I believe the behavior of the TARGETS indicates they knowingly intended to defraud the victims in this case. The TARGETS made efforts to conceal criminal activity and avoid detection by law enforcement while at the same time using multiple access devices at each gas pump.

7. The TARGETS used different access devices at the gas pump for each purchase. On December 18th, 2012 one of the TARGETS was observed attempting as many as eleven (11) different access devices at one pump and having only three (3) successful purchases. The TARGETS would not use the same access device over and over to make multiple purchases at one gas pump, which could raise the suspicion of gas station employees. The TARGETS always visited different gas stations throughout the day, never returning to a previously visited station and running the risk of being recognized by gas station employees.

8. For purposes of this affidavit, when I use the term "counterfeit" and "unauthorized access device", I mean that I or another agent have contacted an issuing bank or card holder and determined that the credit card number being used by the TARGETS had been compromised.

TRAINING AND EXPERIENCE REGARDING COUNTERFEIT CREDIT CARD RINGS

9.     Based on my training and experience, my conversations with agents with over 17 years of experience who specialize in the investigation of crimes such as identity theft, credit card fraud, and other white collar crimes, I have learned the following about counterfeit credit card rings generally, and those that use that use the counterfeit credit cards to steal fuel in bulk, in particular:

10.     Members of the ring commonly maintain equipment to skim legitimate credit card information and re-encode that information on other cards.  Typically this includes credit card skimmers, computer programs for creating re-encoded credit cards, blank credit card stock or credit card sized cards with magnetic strips, such as gift and debit cards.  More sophisticated crews keep images of credit cards to print onto the re-encoded cards, and use credit card embossers to make the counterfeits look genuine.  These groups also often maintain fake identification cards to match the counterfeit credit cards.  The crews commonly possess many identity profiles of victims of identity theft, commonly in digital form on computers.  These items are commonly stored where members of the crew can readily access them, such as their homes, workplaces, vehicles, and public storage units.

11.     Counterfeit credit card crews necessarily require means of communication  in order to coordinate criminal activity with other co-conspirators.  This is particularly true in fuel theft schemes where the individuals need to coordinate delivery schedules and amounts of fuel.  Accordingly, they must necessarily possess the telephone numbers and email addresses of their co-conspirators, which they commonly store in their cellular telephones and computers.  Crew members also typically communicate to each other regarding amounts owed to one another, law enforcement and bank investigations, the failure or success of counterfeit credit card use, fuel purchases, and meeting times and places, among other subjects.  The individuals targeted in this case have been observed using cell phones throughout many surveillance operations conducted in this case.  Crew members typically keep their cellular telephones and computers used to communicate with one another in their residences, vehicles, and workplaces.

12.     Counterfeit credit card crew members typically are paid in cash to minimize a paper trail.  Commonly they store their cash proceeds in their homes, but some also use safety deposit boxes, and they transport their cash proceeds in their vehicles.   Members of the crew cannot use cash for all purchases, however, and so commonly make cash deposits into bank or investment accounts, and send cash by Western Union, wire, or similar means.  Collusive gas stations that purchase the stolen fuel

commonly pay for it in cash so that there are fewer records of the below-market rate they pay. These gas stations often maintain two sets of books, one showing legitimate fuel purchases and sales, and another that includes illicit cash purchases. Typically the records relating to these cash transactions are stored in crew members' residences and workplaces (here, the COMMERCE DEPOT) and at the collusive gas stations.

13.    Individuals who are involved in possessing and using counterfeit and unauthorized access devices often do not discard or destroy paper documents related to their activities and keep them at their residences and personal vehicles. These documents can include logs of fraudulent transactions, monies received, and may refer to names of individuals and companies that have been victimized, and payments to or from co-schemers.

14.  The statements below, which describe surveillance of the TARGETS, FUEL TRUCKS and various premises,  are based on my own observations, my review of other Agent's and Officer's notes, information provided by other Agents and Officers from surveillance operations, personnel at gas stations, issuing banks, and other witnesses. Because the purpose of this affidavit is to demonstrate probable cause for the issuance of the requested complaint and warrants, I have not set forth each and every fact I have learned in connection with this investigation.

15.  As described in detail below, in summary, agents and officers observed the following:

THE CASE AGAINST YERITSYAN, FUEL TRUCKS 1 & 3

16.  On December 7th, 2012, members of the USSS LAFTF conducted surveillance of YERITSYAN and observed the following:

17.  YERITSYAN, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in FUEL TRUCK-3.

18.  YERITSYAN then drove to a 76 gas station located at 3915 E. Olympic Blvd. Los Angeles, CA. There, YERITSYAN was observed swiping multiple credit cards at diesel gas pump #18, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-3. YERITSYAN swiped 4 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions, or holders of the following cards, confirmed that the following access devices used by YERITSYAN to make the purchases were

unauthorized:  Bank of America account numbers ending 84516, 61683, 11917, and Citi Bank account number ending 17298.

19.  YERITSYAN then drove to a 76 gas station located at 1800 E. Olympic Blvd. Los Angeles, CA.  There, YERITSYAN was observed swiping multiple credit cards at diesel gas pump #13 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-3.  YERITSYAN swiped 2 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by YERITSYAN to make the purchases were unauthorized:  Bank of America account number ending 77892 and Capital One Bank account number ending 83291.

20.  YERITSYAN then drove back to the Vernon Depot where THE FUEL TANKER TRUCK was observed parked on the property.  A portable pump device was observed on the ground next to THE FUEL TANKER TRUCK.  Based on my training and experience, I believe the pump and THE FUEL TANKER TRUCK are used to off-load the diesel fuel obtained by the TARGETS and store the fuel for future transport.

21.  YERITSYAN then departed the Vernon Depot in a Porsche SUV bearing California registration plate 6XAL056, which is registered to him, and drove to YERITSYAN'S RESIDENCE.

22.  Continuing on December 10th, 2012, members of the USSS LAFTF conducted surveillance of YERITSYAN and observed the following:

23.  YERITSYAN was observed driving FUEL TRUCK-3 to a Chevron gas station located at 14240 Firestone Blvd. La Mirada, CA.  There, YERITSYAN was observed swiping multiple credit cards at diesel gas pump #12 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-3.  YERITSYAN swiped 1 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institution confirmed that the following access device was used by YERITSYAN to make the purchases were unauthorized:  Capital One Bank account ending 89723,

24.  YERITSYAN then drove to a Shell gas station located at 14204 Rosecrans Ave. La Mirada, CA.  There, YERITSYAN was observed swiping multiple credit cards at diesel gas pump #9 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-3.  YERITSYAN swiped 3 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers

used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by YERITSYAN to make the purchases were unauthorized: Citi Bank account number ending 06739, Wells Fargo Bank account number ending 83745, Bank of America account number ending 50500.

25. YERITSYAN then drove to the Vernon Depot, presumably to off-load the diesel fuel that had been purchased.

THE CASE AGAINST VEISYAN, FUEL TRUCKS 5 & 6

26. On December 10th, 2012, members of the USSS LAFTF conducted surveillance of VEISYAN and observed the following:

27. VEISYAN, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in FUEL TRUCK-5.

28. VEISYAN then drove to a Chevron gas station located at 4557 E. Slauson Ave. Maywood, CA. There, VEISYAN was observed swiping multiple credit cards at diesel gas pump #1, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-5. VEISYAN swiped 4 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by VEISYAN to make the purchases were unauthorized: Honda Federal Credit Union account ending 28323, Capital One Bank account ending 46253, Navy Federal Credit Union account ending 72134, Bank of America account number ending 24218.

29. VEISYAN then drove to a 76 gas station located at 6810 E. Slauson Ave. Commerce, CA. There, VEISYAN was observed swiping multiple credit cards at diesel gas pump #11, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-5. VEISYAN swiped 2 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by VEISYAN to make the purchases were unauthorized: Citi Bank account numbers ending 59204, 85440.

30. VEISYAN then drove to a Chevron gas station located at 7360 Florence Ave. Downey, CA. There, VEISYAN was observed swiping multiple credit cards at diesel gas pump #6, and

pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-5. VEISYAN swiped 4 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by VEISYAN to make the purchases were unauthorized: Capital One Bank account number ending 21958, Wells Fargo Bank account number ending 10967, Bank of America account numbers ending 49352, 09193.

31. VEISYAN then drove to a Chevron gas station located at 7360 Firestone Blvd. Downey, CA. There, VEISYAN was observed swiping multiple credit cards at diesel gas pump #2, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-5. VEISYAN swiped 1 unauthorized access device at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institution or card holder confirmed that the following access device was used by VEISYAN to make the purchases was unauthorized: Bank of America account number ending 08694.

32. VEISYAN then drove to the Vernon Depot, presumably to off-load the diesel fuel that had been purchased.

33. VEISYAN then drove FUEL TRUCK-5 to Corteen Pl. Valley Village, CA. and parked on the street. VEISYAN was observed walking into a property in the area of VEISYAN'S RESIDENCE.

34. Continuing on December 18th, 2012, members of the USSS LAFTF conducted surveillance of VEISYAN and observed the following:

35. VEISYAN was observed departing the Vernon Depot in FUEL TRUCK-6. VEISYAN then drove to a Chevron gas station located at 2301 S. Aviation Blvd. Manhattan Beach, CA. There, VEISYAN was observed swiping multiple credit cards at diesel gas pump #2, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-6. VEISYAN swiped 2 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by VEISYAN to make the purchases were unauthorized: Bank of America account number ending 63749, Wells Fargo Bank account ending 69563.

36. VEISYAN then drove to a Chevron gas station located at 5156 W. Century Blvd. Inglewood, CA. There, VEISYAN was observed swiping multiple credit cards at diesel gas pump

#10, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-6. VEISYAN swiped 1 unauthorized access device at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institution or card holder confirmed that the following access device was used by VEISYAN to make the purchase was unauthorized: Bank of America account ending 38560.

37. VEISYAN departed the location and was stopped by the California Highway Patrol for a traffic violation. The CHP Officer that conducted the traffic stop was contacted by a member of the USSS LAFTF. The CHP Officer stated that the driver of the vehicle identified himself as Albert VEISYAN of 5524 Corteen Pl. #2, Valley Village, CA (VEISYAN'S RESIDENCE). A traffic citation was issued to VEISYAN during the traffic stop.

THE CASE AGAINST DAVIDYAN, FUEL TRUCK-2

38. On December 11th, 2012, members of the USSS LAFTF conducted surveillance of DAVIDYAN and observed the following:

39. DAVIDYAN, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in FUEL TRUCK-2.

40. DAVIDYAN then drove to a Chevron gas station located at 6320 Holmes Ave, Los Angeles, CA. There, DAVIDYAN was observed swiping multiple credit cards at diesel gas pump #4, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-2. DAVIDYAN swiped 1 unauthorized access device at the pump. Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card numbers used for those transactions. The following financial institution or card holder confirmed that the following access device used by DAVIDYAN to make the purchases was unauthorized: Bank of America account number ending 52870.

41. DAVIDYAN then drove to a Chevron gas station located at 3250 Firestone Blvd., South Gate, CA. There, DAVIDYAN was observed swiping multiple credit cards at diesel gas pump #1, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-2. DAVIDYAN swiped 2 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access

devices used by DAVIDYAN to make the purchases were unauthorized: Bank of America account numbers ending 74987, 21217.

42. DAVIDYAN then drove to a 76 gas station located at 1800 E. Olympic Blvd., Los Angeles, CA. There, DAVIDYAN was observed swiping multiple credit cards at diesel gas pump #9, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-2. DAVIDYAN swiped 8 unauthorized access devices at the pump cards at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by DAVIDYAN to make the purchases were unauthorized: Wells Fargo Bank account number ending 81745, Citi Bank account numbers ending 57606, 18535, Chase Bank account number ending 29725, Capital One Bank account numbers ending 01421, 14138 and USAA Savings Bank account numbers ending 92389, 92097.

43. DAVIDYAN then drove to COMMERCE DEPOT where he was observed parking FUEL TRUCK-2 next to a gas tanker located inside the garage. DAVIDYAN was observed placing a hose from the gas tanker to FUEL TRUCK-2, presumably to off-load the fuel that had been purchased.

44. DAVIDYAN then drove to a Chevron gas station located at 11529 Carson Ave., Long Beach, CA. There, DAVIDYAN was observed swiping multiple credit cards at diesel gas pump #17, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-2. DAVIDYAN swiped 1 unauthorized access device at the pump. Members of the LAFTF noted the pump number and time of the credit card transactions, and obtained from the gas station the credit card number used for those transactions. The following financial institution or card holder confirmed that the following access device used by DAVIDYAN to make the purchases was unauthorized: Chase Bank account number ending 62581.

45. DAVIDYAN then drove to a Shell gas station located at 6819 Carson St., Lakewood, CA. There, DAVIDYAN was observed swiping multiple credit cards at diesel gas pump #1, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-2. DAVIDYAN swiped 1 unauthorized access device at the pump. Members of the LAFTF noted the pump number and time of the credit card transactions, and obtained from the gas station the credit card number used for that transaction. The following financial institution or card holder confirmed that the following access device was used by DAVIDYAN to make the purchases was unauthorized: Capital One Bank account number ending 21921.

46.  DAVIDYAN then drove to a Chevron gas station located at 11804 Carson St., Hawaiian Gardens, CA.  There, DAVIDYAN was observed swiping multiple credit cards at diesel gas pump #11, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-2.  DAVIDYAN swiped 1 unauthorized access device at the pump.  Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card number used for that transaction.  The following financial institution or card holder confirmed that the following access device was used by DAVIDYAN to make the purchases was unauthorized:  Capital One bank account number ending 95662.

47.  DAVIDYAN then drove to COMMERCE DEPOT, presumably to off-load the diesel fuel that had been purchased.

48.  DAVIDYAN then drove to the Vernon Depot where he was observed exiting the location on foot and entering a grey Volkswagen Passat bearing California registration plate 5KVE640.  This vehicle is registered to DAVIDYAN and was eventually driven to DAVIDYAN'S RESIDENCE.

THE CASE AGAINST APIKOV, FUEL TRUCKS 7 & THE FUEL TANKER TRUCK

49.  On December 11th, 2012, members of the USSS LAFTF conducted surveillance of APIKOV.  APIKOV was observed departing the Vernon Depot and driving to APIKOV'S RESIDENCE.

50.  On December 18th, 2012, members of the USSS LAFTF conducted surveillance of APIKOV and observed the following:

51.  APIKOV, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in FUEL TRUCK-7.

52.  APIKOV then drove to a Chevron gas station located at 3900 Rosemead Blvd., Pico Rivera, CA.  There, APIKOV was observed swiping multiple credit cards at a diesel gas pump, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7.  APIKOV swiped 3 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by APIKOV to make the purchases were unauthorized:  Bank of America account numbers ending 38959, 15984 and Citi Bank account number ending 65127.

53.  APIKOV then drove to a Chevron gas station located at 1500 Paramount Blvd. Montebello, CA.  There, APIKOV was observed swiping multiple credit cards at diesel gas pump #8, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7.  APIKOV swiped 2 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by APIKOV to make the purchases were unauthorized:  Chase Bank account number ending 70560, Bank of America account number ending 13562

54.  APIKOV then drove to the Vernon Depot where he was observed by members of the USSS LAFTF off-loading the diesel fuel from FUEL TRUCK-7 into THE FUEL TANKER TRUCK. APIKOV used a pump device to conduct the transfer between vehicles.

55.  APIKOV then drove to a Chevron gas station located at 6602 E. Alondra Blvd., Paramount, CA.  There, APIKOV was observed swiping multiple credit cards at diesel gas pump #4, and pumping diesel fuel into a fuel storage tank located FUEL TRUCK-7.  APIKOV swiped 4 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by APIKOV to make the purchases were unauthorized:  Capital One Bank account numbers ending 79725, 75447, 13388 and Bank of America account number ending 02627.

56.  APIKOV then drove to the Vernon Depot where he was observed by members of the USSS LAFTF off-loading the diesel fuel from FUEL TRUCK-7 into THE FUEL TANKER TRUCK. APIKOV used a pump device to conduct the transfer between vehicles.

57.  APIKOV then drove to a Chevron gas station located at 1105 Santa Anita Ave. South El Monte, CA.  There, APIKOV was observed swiping multiple credit cards at diesel gas pump #12, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7.  APIKOV swiped 2 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by APIKOV to make the purchases were unauthorized:  Citi Bank account number ending 48633, Chase Bank account number ending 6523.

58.  APIKOV then drove to a 76 gas station located at 13106 Valley Blvd. La Puente, CA. There, APIKOV was observed swiping multiple credit cards at diesel gas pump #10, and pumping

diesel fuel into a fuel storage tank located inside FUEL TRUCK-7. APIKOV swiped 2 unauthorized access devices at the pump. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by APIKOV to make the purchases were unauthorized: Citi Bank account number ending 18445, Capital One Bank account number ending 03229.

59. APIKOV then drove to the Vernon Depot where he was observed by members of the USSS LAFTF off-loading the diesel fuel from FUEL TRUCK-7 into THE FUEL TANKER TRUCK. APIKOV used a pump device to conduct the transfer between vehicles.

60. APIKOV then departs the Vernon Depot on foot and enters a white Mitsubishi sedan bearing California registration plate 6WHA338. APIKOV drove to the Commerce Casino and was positively identified by USSS LAFTF members when surveillance cameras in the casino captured video of APIKOV's California Drivers License.

THE CASE AGAINST MARGOUSIAN, FUEL TRUCK 4

61. On January 8th, 2013, members of the USSS LAFTF conducted surveillance of MARGOUSIAN and observed the following:

62. MARGOUSIAN, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in his personal vehicle, a blue Hyundai Sonata bearing California registration plate 5AFN153, and driving to MARGOUSIAN'S RESIDENCE.

63. Continuing on January 9th, 2013, members of the USSS LAFTF conducted surveillance of MARGOUSIAN and observed the following:

64. MARGOUSIAN departed the Vernon Depot driving FUEL TRUCK-4. MARGOUSIAN then drove to a Chevron gas station located at 9225 Brookhurst St., Anaheim, CA. There, MARGOUSIAN was observed swiping multiple credit cards at diesel gas pump #1 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-4. MARGOUSIAN swiped 2 unauthorized access devices at the pump totaling $249.30 worth of purchases. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by MARGOUSIAN to make the purchases

were unauthorized: US Bank account number ending 84923, Wescom Credit Union account number ending 94399.

65. Continuing on January 10th, 2013, members of the USSS LAFTF conducted surveillance of MARGOUSIAN and observed the following:

66. MARGOUSIAN departed the Vernon Depot driving FUEL TRUCK-4. MARGOUSIAN then drove to a Chevron gas station located at 1628 Washington Blvd., Montebello, CA. There, MARGOUSIAN was observed swiping multiple credit cards at diesel gas pump #1 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-4. MARGOUSIAN swiped 1 unauthorized access device at the pump totaling $125.00 worth of purchases. Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card number used for those transactions. The following financial institution or card holder confirmed that the following access device used by MARGOUSIAN to make the purchases was unauthorized: Citi Bank account number ending 34086.

67. MARGOUSIAN then drove to a Chevron gas station located at 11770 E. Washington Blvd. Whittier, CA. There, MARGOUSIAN was observed swiping multiple credit cards at diesel gas pump #3 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-4. MARGOUSIAN swiped 1 unauthorized access device at the pump totaling $124.76 worth of purchases. Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card number used for that transaction. The following financial institution or card holder confirmed that the following access device used by MARGOUSIAN to make the purchases was unauthorized: US Bank account number ending 84923.

68. MARGOUSIAN then drove to a Chevron gas station located at 501 Whittier Blvd., La Habra, CA. There, MARGOUSIAN was observed swiping multiple credit cards at diesel gas pump #6 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-4. MARGOUSIAN swiped 2 unauthorized access devices at the pump totaling $249.27 worth of purchases. Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions. The following financial institutions or card holders confirmed that the following access devices used by MARGOUSIAN to make the purchases were unauthorized: Chase Bank account number ending 12476, Bank of America account number ending 09676.

69. MARGOUSIAN then drove to a Chevron gas station located at 12911 Whittier Blvd. Whittier, CA. There, MARGOUSIAN was observed swiping multiple credit cards at diesel gas pump

#1 and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-4.  MARGOUSIAN swiped 1 unauthorized access device at the pump totaling $124.62 worth of purchases.  Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card number used for that transaction.  The following financial institution or card holder confirmed that the following access device used by MARGOUSIAN to make the purchases was unauthorized:  Capital One bank account number ending 41406.

70.  MARGOUSIAN then drove to the Vernon Depot, presumably to off-load the diesel fuel that had been purchased.

THE CASE AGAINST GHAZARYAN, FUEL TRUCK-8

71.  On January 14th, 2013, members of the USSS LAFTF conducted surveillance of GHAZARYAN and observed the following:

72.  GHAZARYAN, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in FUEL TRUCK-8.

73.  GHAZARYAN then drove to a 76 gas station located at 6810 E. Slauson Ave., Commerce, CA.  There, GHAZARYAN was observed swiping multiple credit cards at diesel gas pump #12, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-8.  GHAZARYAN swiped 3 unauthorized access devices at the pump totaling $299.82 worth of purchases.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by GHAZARYAN to make the purchases were unauthorized:  Citi Bank account numbers ending 80684, 34144 and American Express account number ending 821010.

74.  GHAZARYAN then drove to a Chevron gas station located at 3300 La Cienega Blvd., Los Angeles, CA.  There, GHAZARYAN was observed swiping multiple credit cards at diesel gas pump #10, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-8.  GHAZARYAN swiped 5 unauthorized access devices at the pump totaling $750.00 worth of purchases.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by GHAZARYAN to make the

purchases were unauthorized:  Bank of America account numbers ending 55093, 67138, 78009, Capital One Bank account number ending 25982, Citi Bank account number ending 21479.

75.  GHAZARYAN then drove to the Vernon Depot, presumably to off-load the diesel fuel that had been purchased.

76.  USSS LAFTF members observed GHAZARYAN departing the Vernon Depot in his personal vehicle, a white BMW SUV bearing California registration plate 6KYW972, registered to GHAZARYAN'S RESIDENCE.

THE CASE AGAINST KARAPETYAN, FUEL TRUCK-7

77.  On January 30th, 2013, members of the USSS LAFTF conducted surveillance of KARAPETYAN and observed the following:

78.  KARAPETYAN's personal vehicle, a grey Subaru sedan bearing California registration plates 6TSA279, was observed parked on the street near the Vernon Depot.  KARAPETYAN, whom USSS LAFTF members later positively identified by matching his DMV photo and personal vehicle registration information to their observations, was observed departing the Vernon Depot in FUEL TRUCK-7.

79.  KARAPETYAN then drove to a 76 gas station located at 17971 Brookhurst St., Fountain Valley, CA.  There, KARAPETYAN was observed swiping multiple credit cards at diesel gas pump #8, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7.  KARAPETYAN swiped 2 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by KARAPETYAN to make the purchases were unauthorized:  Citi Bank account numbers 79126, 99368.

80.  KARAPETYAN then drove to a Chevron gas station located at 17472 Beach Blvd., Huntington Beach, CA.  There, KARAPETYAN was observed swiping multiple credit cards at diesel gas pump #14, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7.  KARAPETYAN swiped 1 unauthorized access device at the pump.  Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institution or card holder confirmed that the following access device used by KARAPETYAN to make the purchases was unauthorized: NuVision Federal Credit Union account number ending 51295.

81.  KARAPETYAN then drove to a Shell gas station located at 8990 Bolsa Ave., Westminster, CA.  There, KARAPETYAN was observed swiping multiple credit cards at diesel gas pump #1, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7. KARAPETYAN swiped 2 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by KARAPETYAN to make the purchases were unauthorized:  Bank of America account numbers ending 93499, 92640.

82.  Continuing on January 31st, 2013, members of the USSS LAFTF conducted surveillance of KARAPETYAN and observed the following:

83.  KARAPETYAN's personal vehicle, a grey Subaru sedan bearing California registration plates 6TSA279, was observed parked on the street near the Vernon Depot.  KARAPETYAN was observed departing the Vernon Depot in FUEL TRUCK-7.

84.  KARAPETYAN then drove to a Chevron gas station located at 1700 W. Wardlow Rd., Long Beach, CA.  There, KARAPETYAN was observed swiping multiple credit cards at diesel gas pump #3, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7. KARAPETYAN swiped 1 unauthorized access device at the pump.  Members of the LAFTF noted the pump number and time of the credit card transaction, and obtained from the gas station the credit card numbers used for that transaction.  The following financial institution or card holder confirmed that the following access device used by KARAPETYAN to make the purchases was unauthorized:  Citi Bank account number ending 61830.

85.  KARAPETYAN then drove to a Shell gas station located at 1990 E. Del Amo Blvd., Long Beach, CA.  There, KARAPETYAN was observed swiping multiple credit cards at diesel gas pump #8, and pumping diesel fuel into a fuel storage tank located inside FUEL TRUCK-7.  KARAPETYAN swiped 3 unauthorized access devices at the pump.  Members of the LAFTF noted the pump number and times of the credit card transactions, and obtained from the gas station the credit card numbers used for those transactions.  The following financial institutions or card holders confirmed that the following access devices used by KARAPETYAN to make the purchases were unauthorized:  Bank of America account numbers ending 41105, 09742, and 52451.

HOVANESYAN'S INVOLVEMENT, HOVANESYAN'S VEHICLE-1, A-Z GAS STATION and
PETRO BRAS GAS STATION

86.  On December 11th, 2012, members of the USSS LAFTF conducted surveillance of the
Vernon Depot and observed the following:

87.  An individual whose appearance was consistent with HOVANESYAN was observed
arriving at the Vernon Depot in a silver Mercedes Benz sedan, which is consistent with
HOVANESYAN'S VEHICLE-1.  That vehicle had been previously identified by members of the
USSS LAFTF as one of HOVANESYAN'S personal vehicles.

88.  HOVANESYAN exited his vehicle and walked directly to THE FUEL TANKER TRUCK
to view paperwork located inside the cab.  HOVANESYAN then met with 2 individuals that had been
seen operating smaller utility trucks and off-loading those truck's contents into THE FUEL TANKER
TRUCK.  One of the individual's appearance was consistent with GHAZARYAN, his personal
vehicle was also present at the time.

89.  GHAZARYAN was observed entering the cab of a white Ford utility truck, removing
paperwork, and taking it to HOVANESYAN.  At the time, HOVANESYAN was seated in THE FUEL
TANKER TRUCK.  GHAZARYAN handed the paperwork to HOVANESYAN who exchanged it for
unknown items.

90.  GHAZARYAN was observed removing items from the utility truck, while it continued
off-loading into THE FUEL TANKER TRUCK.  These items were taken to HOVANESYAN, who
was seated in the driver's seat of THE FUEL TANKER TRUCK, and exchanged for unknown items.

91.  HOVANESYAN exited THE FUEL TANKER TRUCK and moved his Mercedes sedan
to a new location at the Vernon Depot.

92.  GHAZARYAN then departed the Vernon Depot in his white BMW X5 SUV.
HOVANESYAN checked the fuel level inside the tanker using a large rod, then departed the location
driving THE FUEL TANKER TRUCK.

93.  HOVANESYAN has been observed by members of the USSS LAFTF making deliveries
to A-Z GAS STATION and PETRO BRAS GAS STATION utilizing THE FUEL TANKER TRUCK.
In total, HOVANESYAN has been observed making 4 deliveries to A-Z GAS STATION.  Those
deliveries were observed on November 27th, 28th, 2012, January 14th, 2013 and February 4th, 2013.
HOVANESYAN was observed making 2 deliveries to PETRO BRAS GAS STATION.  Those
deliveries were observed on January 28th, 2013 and February 20th, 2013.

TARGETS INTERACT AT THE Vernon Depot

94. On December 18th, 2012, members of the USSS LAFTF conducted surveillance of the Vernon Depot and observed the following:

95. Agents observe a white Mitsubishi sedan (that they later saw operated by APIKOV) parked on the south side of E. 43rd St. Mobile surveillance of APIKOV is conducted on this day as well.

96. A white BMW X5 SUV matching the description of GHAZARYAN's personal vehicle is parked inside the fence line at the depot. Two individuals are seen walking around the depot area.

97. An individual whose appearance was consistent with DAVIDYAN arrives in his personal vehicle, a silver Volkswagen sedan and parks on E. 43rd St. DAVIDYAN immediately enters a utility truck parked at the depot.

98. An individual whose appearance was consistent with MARGOUSIAN arrives in his personal vehicle, a dark blue Hyundai sedan and parks on E. 43rd St. MARGOUSIAN enters a white Ford Excursion, which is consistent with the description of FUEL TRUCK-4, while talking to other subjects at the depot.

99. An individual whose appearance was consistent with YERITSYAN arrives in his personal vehicle, a dark colored Porsche SUV, and parks inside the fence line. YERITSYAN enters a brown Ford Excursion, which is consistent with the description of FUEL TRUCK-3, and departs the depot.

100. Later in the day an individual whose appearance was consistent with YERITSYAN arrives in a brown Ford Excursion, which is consistent with the description of FUEL TRUCK-3, and begins to off-load into THE FUEL TANKER TRUCK. At this time an individual whose appearance was consistent with DAVIDYAN arrives in a white utility truck with no ladder rack, exits the vehicle, and has a conversation with YERITSYAN while waiting for his turn to off-load. Once YERITSYAN concludes off-loading FUEL TRUCK-3, he relocates the vehicle and allows DAVIDYAN to off-load his utility truck into THE FUEL TANKER TRUCK. DAVIDYAN and YERITSYAN continue their conversation at this time. YERITSYAN eventually departs the depot while DAVIDYAN finishes off-loading his vehicle.

101. Agents later observe an individual whose appearance was consistent with YERITSYAN arrive in a brown Ford Excursion, which is consistent with the description of FUEL TRUCK-3. The individual whose appearance was consistent with DAVIDYAN arrives at the depot in a white utility truck with no ladder rack at the same time. DAVIDYAN begins off-loading his vehicle into THE

FUEL TANKER TRUCK while YERITSYAN waits to off-load FUEL TRUCK-3.  At this time they have another conversation.

102.  Once DAVIDYAN concludes off-loading, he moves his utility truck to another location at the depot.  DAVIDYAN is observed entering his Volkswagen sedan and leaving the area.

103.  VEISYAN is observed entering the depot in a grey Dodge utility truck, FUEL TRUCK-6.  VEISYAN had been observed and identified during the day by other members of the USSS LAFTF conducting mobile surveillance.

104.  Once YERITSYAN concluded off-loading his vehicle into THE FUEL TANKER TRUCK, he allowed VEISYAN to begin off-loading FUEL TRUCK-6 into THE FUEL TANKER TRUCK.  YERITSYAN and VEISYAN have a conversation at this time.

105.  An individual whose appearance was consistent with GHAZARYAN and VEISYAN appear to have a conversation while VEISYAN off-loads his vehicle and GHAZARYAN checks the fuel level inside THE FUEL TANKER TRUCK using a large rod.

106.  Once VEISYAN concludes off-loading his vehicle he departs the depot.  GHAZARYAN concludes checking the fuel level inside THE FUEL TANKER TRUCK, is observed entering his white BMW X5 SUV, and departing the depot.

## COMMERCE DEPOT USED FOR VEHICLE STORAGE AND FUEL OFF-LOADING, HOVANESYAN'S VEHICLE-2

107.  Initially the TARGETS were observed using the Vernon Depot (which is not part of this warrant), but later shifted their operations to the COMMERCE DEPOT as a base of operations for the fuel theft scheme.

108.  On February 20th, 2013, members of the USSS LAFTF conducted surveillance of HOVANESYAN and observed him arrive at the Vernon Depot in HOVANESYAN'S VEHICLE-2, which had been previously identified as his personal vehicle through a California Department of Motor vehicles records check.  HOVANESYAN then departed the Vernon Depot in THE FUEL TANKER TRUCK and made a delivery to PETRO BRAS GAS STATION.  HOVANESYAN was then observed driving THE FUEL TANKER TRUCK to COMMERCE DEPOT.

109.  Since that date, THE FUEL TANKER TRUCK has been primarily located at COMMERCE DEPOT.  On March 5th, 2013 and April 3rd, 2013, members of the USSS LAFTF observed THE FUEL TANKER TRUCK parked at COMMERCE DEPOT along with 2 utility trucks and a large fuel tanker trailer.

110. On April 7th, 2013 members of the USSS LAFTF observed suspect GHAZARYAN driving FUEL TRUCK-8 to COMMERCE DEPOT after making multiple fuel purchases at 2 gas stations. GHAZARYAN'S activities on that day were consistent with the fuel theft scheme described in this affidavit. It is reasonable to believe that GHAZARYAN was returning to COMMERCE DEPOT to off-load FUEL TRUCK-8's contents into THE FUEL TANKER TRUCK

111. Data from a GPS tracker device placed on THE FUEL TANKER TRUCK pursuant to a warrant indicates the following: Since March 5th, 2013 THE FUEL TANKER TRUCK has made at least 44 deliveries of fuel, 20 deliveries to A-Z GAS STATION and 24 deliveries to PETRO BRAS GAS STATION. When not making deliveries, GPS tracker data indicates that THE FUEL TANKER TRUCK is located at COMMERCE DEPOT.

112. Based on the observations described above, it is reasonable to believe that the diesel fuel contents of THE FUEL TANKER TRUCK are being loaded into the vehicle at the COMMERCE DEPOT by FUEL TRUCKS 2-8 and not through legitimate means.

A-Z GAS STATION, PETRO BRAS GAS STATION, AND RECORDS OF FUEL PURCHASES

113. Throughout the course of this investigation, A-Z GAS STATION and PETRO BRAS GAS STATION have received multiple fuel deliveries from THE FUEL TANKER TRUCK. Members of the USSS LAFTF have observed 8 deliveries between these 2 locations. Additional data gathered from GPS tracking devices placed on THE FUEL TANKER TRUCK has indicated that between the dates of March 5th, 2013 and April 17th, 2013, THE FUEL TANKER TRUCK made 20 deliveries to A-Z GAS STATION and 24 deliveries to PETRO BRAS GAS STATION. Based on observations made during this investigation it is reasonable to believe that the contents of each delivery of fuel made to these gas stations by THE FUEL TANKER TRUCK have been obtained by fraudulent means.

114. I know based on my training, experience and observations, that most gas stations contain computers that generate receipts for purchases of fuel by customers. Based on the amount of deliveries made to A-Z GAS STATION and PETRO BRAS GAS STATION, it is my opinion that they are collusive gas stations that purchase stolen fuel from members of the fuel theft scheme described above at discounted prices and resell the fuel to customers. I believe that the records of the purchases and sale of fuel (including computerized records on digital devices) will demonstrate that the owners or operators of A-Z GAS STATION and PETRO BRAS GAS STATION are selling more fuel than they purchase through legitimate means.

## OGANESIAN'S INVOLVEMENT

115. On February 25th, 2013, members of the USSS LAFTF conducted surveillance of HOVANESYAN, who was driving HOVANESYAN'S VEHICLE-1.  Based on their training and experience, members of the USSS LAFTF formed the opinion that HOVANESYAN was utilizing counter-surveillance techniques.

116. HOVANESYAN was observed multiple times making sudden U-turns and randomly pulling over to the curb on surface streets attempting to identify Officers conducting surveillance. HOVANESYAN was also observed stopping his vehicle in the shoulder of Interstate 5, exiting the vehicle, and watching traffic as it passed in an attempt to identify Officers conducting surveillance.  At this time members of the USSS LAFTF requested assistance from the Los Angeles Police Department Air Support Division in an attempt to maintain the surveillance of HOVANESYAN at a safe distance.

117. Since that date, OGANESIAN has been the only person observed by members of the USSS LAFTF operating THE FUEL TANKER TRUCK.  OGANESIAN was observed on April 9th, 2013 departing COMMERCE DEPOT operating THE FUEL TANKER TRUCK and driving to PETRO BRAS GAS STATION to make a fuel delivery.  Later that day he was observed arriving at COMMERCE DEPOT in THE FUEL TANKER TRUCK, departing COMMERCE DEPOT in OGANESIAN'S VEHICLE and arriving at OGANESIAN'S RESIDENCE.  OGANESIAN was observed on April 10th, 2013 arriving at COMMERCE DEPOT in OGANESIAN'S VEHICLE, departing COMMERCE DEPOT in THE FUEL TANKER TRUCK and driving to A-Z GAS STATION to make a fuel delivery.  Later that day he was observed arriving at COMMERCE DEPOT in THE FUEL TANKER TRUCK and departing the location in OGANESIAN'S VEHICLE.

118. Based on these observations it is reasonable to believe that OGANESIAN was approached by HOVANESYAN to take over fuel tanker delivery duties so HOVANESYAN could attempt to distance himself from the fuel theft operation.

## IDENTIFICATION OF RESIDENCES

119. The residences listed in this affidavit have been identified by conducting surveillance operations as well as using information obtained from the California Department of Motor Vehicles (hereinafter "CA DMV") for personal vehicle registrations and driver's license information belonging to the TARGETS, HOVANESYAN and OGANESIAN.

120. HOVANESYAN'S driver's license and three personal vehicles are all registered to HOVANESYAN'S RESIDENCE according to records obtained from CA DMV. An Agent with the USSS LAFTF conducted surveillance on April 25th, 2013 and observed one of HOVANESYAN'S personal vehicles parked at HOVANESYAN'S RESIDENCE. Additionally, three previous surveillance operations conducted by members of the USSS LAFTF revealed HOVANESYAN operating his personal vehicles to and from HOVANESYAN'S RESIDENCE.

121. OGANESIAN'S driver's license and a vehicle he has been observed operating are registered to OGANESIAN'S RESIDENCE according to records obtained from CA DMV. Members of the USSS LAFTF conducted surveillance of OGANESIAN on April 9th, 2013 and observed OGANESIAN enter OGANESIAN'S RESIDENCE.

122. VEISYAN'S driver's license and four personal vehicles are all registered to VEISYAN'S RESIDENCE according to records obtained from CA DMV. Agents with the USSS LAFTF conducted surveillance on May 9th, 2013 and observed one of VEISYAN'S personal vehicles parked in a secure parking area belonging to the property where VEISYAN'S RESIDENCE is located. Additionally, two previous surveillance operations conducted by members of the USSS LAFTF revealed FUEL TRUCK-5 and FUEL TRUCK-6 parked on the same street at VEISYAN'S RESIDENCE near the residence address.

123. GHAZARYAN'S personal vehicle is registered to GHAZARYAN'S RESIDENCE according to records obtained from CA DMV. Members of the USSS LAFTF conducted surveillance on May 14th, 2013 and observed GHAZARYAN exiting the parking garage of GHAZARYAN'S RESIDENCE in a vehicle registered to an individual whose name appears on the building's directory for GHAZARYAN'S RESIDENCE.

124. DAVIDYAN'S driver's license and two personal vehicles are all registered to DAVIDYAN'S RESIDENCE according to records obtained from CA DMV. Members of the USSS LAFTF conducted surveillance on May 7th, 2013 and observed DAVIDYAN depart DAVIDYAN'S RESIDENCE in FUEL TRUCK-3 which was parked on the street near the residence.

125. APIKOV'S personal vehicle is registered to APIKOV'S RESIDENCE according to records obtained from CA DMV. Another vehicle APIKOV has been observed operating is also registered to APIKOV'S RESIDENCE, in a different name. Members of the USSS LAFTF conducted surveillance on May 8th, 2013 and observed APIKOV depart the parking garage of APIKOV'S RESIDENCE in APIKOV'S personal vehicle.

126. YERITSYAN'S driver's license is registered to YERITSYAN'S RESIDENCE according to records obtained from CA DMV. Members of the USSS LAFTF conducted surveillance on May 7th, 2013 and observed YERITSYAN'S personal vehicle depart from the parking lot of YERITSYAN'S RESIDENCE. YERITSYAN was observed arriving at YERITSYAN'S RESIDENCE in his personal vehicle on an earlier surveillance operation conducted by members of the USSS LAFTF as well.

127. MARGOUSIAN'S personal vehicle is registered to MARGOUSIAN'S RESIDENCE according to records obtained from CA DMV. Members of the USSS LAFTF conducted surveillance on May 8th, 2013 and observed MARGOUSIAN'S personal vehicle depart from the area of MARGOUSIAN'S RESIDENCE. MARGOUSIAN was observed arriving at MARGOUSIAN'S RESIDENCE in his personal vehicle on an earlier surveillance operation conducted by members of the USSS LAFTF as well.

128. KARAPETYAN has two personal vehicles registered to KARAPETYAN'S RESIDENCE according to records obtained from CA DMV. Members of the USSS LAFTF conducted surveillance on May 9th, 2013 and observed KARAPETYAN exit the door to KARAPETYAN'S RESIDENCE, enter his personal vehicle and depart the area.

REQUEST FOR NIGHT SERVICE

129. Permission to execute all the search warrants at any time of day or night is requested. During 14 surveillance operations, multiple TARGETS were observed either operating the FUEL TRUCKS in and out of the DEPOT locations or departing their RESIDENCES before 6 AM. Indeed, the TARGETS usually began operating the FUEL TRUCKS before 6 AM.

130. Members of the USSS LAFTF seek to enter all RESIDENCES listed in this affidavit prior to 6 AM with the goal of arresting the TARGETS at their residences before they depart to conduct criminal activity. If we waited until 6 AM to serve the search warrants, then the TARGETS would already be on the road in the FUEL TRUCKS, making it difficult to even locate them, let alone to execute the search and arrest warrants simultaneously, which is essential. Because the TARGETS work together, it is very likely that as soon as one of the TARGETS learns of the warrants, he (or even one of his family members) will seek to warn his co-conspirators. Thus, if we are not able to execute the warrants simultaneously, members of this conspiracy and those closest to them will have an opportunity to destroy or hide evidence. Since much of the evidence that I expect we will recover – counterfeit credit cards and cellular telephones used to transmit messages about them – are small and

easily disposed of, particularly by someone who is already driving who could just throw them out the window, we must execute all the warrants simultaneously.  And because the TARGETS typically begin driving to execute their scheme before 6:00 AM, the only way to ensure that we can locate the TARGETS and FUEL TRUCKS in order to simultaneously execute the warrants is to do so before they start driving.

131.  While the fixed-address search warrant locations will not be hard to locate, I nevertheless request permission to execute those search warrants prior to 6 AM, too.  Given the size of the conspiracy, once the first warrant or two is executed, news of them will spread rapidly, and would permit the hiding or destruction of evidence at other locations if they were not searched simultaneously.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

132.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## ITEMS TO BE SEIZED

133.  The items to be seized are listed in Attachment B, which is incorporated by reference.

POTENTIAL LOSS & A HISTORY OF FUEL THEFT SCHEMES

134.   If members of this scheme were to only operate 4 of the possible 7 FUEL TRUCKS used in this case 5 days a week, this fuel theft scheme has had the potential to commit over $2,880,000.00 dollars in fraud over the 10 month period of this investigation.  It should be noted that during the course of this investigation, members of the USSS LAFTF have observed more than 4 FUEL TRUCKS operating during a single day and that the FUEL TRUCKS have been observed operating on weekend days.

135.   Operating at full capacity, the scheme has had the potential to commit over $7,000,000.00 dollars of fraud.  Based on observations made by members of the USSS LAFTF, it is reasonable to believe that the fuel storage tanks located within each FUEL TRUCK has a capacity of up to 300 gallons.  If each FUEL TRUCK fills-up 3 times per day, which has been observed by USSS LAFTF members in the past, the FUEL TRUCKS can obtain 900 gallons of diesel fuel per day.  At that rate, operating 7 days a week over the course of 10 months, this scheme had the potential to obtain 1,764,000 gallons of diesel fuel.  According to the United States Department of Energy the average diesel fuel price over the past 10 months has been $3.98, which would value that amount of diesel fuel at $7,020,720.

136.  I asked Barbara Riblet, who has 37 years of experience in the banking industry and currently works as a fraud investigator with Bank of America, to estimate when this fuel scheme began based on Bank of America records of unauthorized access devices.  She told me that their records indicated that the scheme began in 2008 or before.

IMMIGRATION STATUS

137.  According to United States Immigration and Customs Enforcement, DAVIDYAN is in the United States legally under asylum status and filed for Lawful Permanent Resident status on January 7th, 2013.  GHAZARYAN, MARGOUSIAN and KARAPETYAN currently have Lawful Permanent Resident status.

**CONCLUSION**

138.  Based on the foregoing facts and my training and experience, I believe there is probable cause to believe that VAHE DAVIDYAN, ROMAN YERITSYAN, ARTIN MARGOUSIAN, ALBERT VEISYAN, GENNADI APIKOV, HARUTYUN KARAPETYAN, and ARTUR

GHAZARYAN have committed violations of Title 18, United States Code, Sections 1349 and 1344. I further submit that there is probable cause to believe evidence of violations of Title 18, United States Code, Sections 1028, 1029, 134 and 1349 will be found at COMMERCE DEPOT, A-Z GAS STATION, PETRO BRAS GAS STATION, DAVIDYAN'S RESIDENCE, YERITSYAN'S RESIDENCE, MORGOUSIAN'S RESIDENCE, VEISYAN'S RESIDENCE, APIKOV'S RESIDENCE, KARAPETYAN'S RESIDENCE, GHAZARYAN'S RESIDENCE, HOVANESYAN'S RESIDENCE, OGANESIAN'S RESIDENCE, THE FUEL TANKER TRUCK, FUEL TRUCKS 2-8, HOVANESYAN'S VEHICLE 1-3 and OGANESIAN'S VEHICLE. Finally, I request that the search warrants be executable at any time of the day or night.

_____
Mark Ham
Special Agent
United States Secret Service

Subscribed and Sworn before me
On this 24 day of May, 2013

ANDREW J. WISTRICH
_____
UNITED STATES MAGISTRATE JUDGE

33